# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| Rochelle Cramer, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>WithumSmith+Brown, PC; Wildermuth Fund; Wildermuth Advisory, LLC; Daniel Wildermuth; Gerard Scarpati, Carol Wildermuth, Anthony Lewis, R. Martel Dey, Randall Fretz, and Donald R. Henry,<br><br>Defendants. | NO. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Rochelle Cramer ("Plaintiff"), individually and on behalf of all others similarly situated, by and through Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to the Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through its attorneys, which included, among other things, a review of public documents, public filings, shareholder communications, and information readily available on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    SUMMARY OF THE ACTION

1.    This is a federal securities class action on behalf of a class (the "Class") consisting of all persons and entities (other than the Defendants, defined herein, and certain related persons and entities) that purchased Class A (WESFX), Class C (WEFCX), and/or Class I (WEIFX) shares in the Wildermuth Fund from November 1, 2020 through June 29, 2023, inclusive (the "Class

1

Period") seeking to recover compensable damages caused by Defendants' violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and/or Sections 36(b) and 47(b) of the Investment Company Act of 1940 (the "1940 Act").

2.    The Wildermuth Fund (a.k.a. the Wildermuth Endowment Fund and Wildermuth Endowment Strategy Fund) (hereinafter, the "Fund") is a closed-end fund that reportedly provided long-term capital appreciation to investors by investing in a diversified portfolio of early-stage private equity positions in various asset classes including technology, real estate, healthcare, energy, and hedge funds, according to its website. The Fund initially claimed that it would invest in a total mix of both liquid, traditional equity and fixed income investments and less liquid, alternative and non-traditional investments. It then shifted its focus to private equity, stating that its goal was "to increase total portfolio return while managing an acceptable level of risk through diversifying into performance-oriented assets other than U.S. stocks and bonds."

3.    Fund President and CEO Defendant Daniel Wildermuth (hereinafter "Daniel Wildermuth" or "CEO Defendant") touted the virtues of private equity stating that his goal was to give investors exposure to "something that is professionally managed and has *high quality assets* in the private market sector."  But unbeknownst to Fund investors, the Fund was not purchasing "high quality assets." Instead, the Fund was purchasing interests in portfolio companies that mostly benefited Defendant Wildermuth Advisory, LLC (the "Adviser") and its owners, married couple Daniel and Carol Wildermuth (collectively the "Adviser Defendants"). Carol Wildermuth also was the founder and CEO of Kalos Capital, a broker-dealer that earned commissions and fees on the sale of Wildermuth Fund and alternative investments.  The CEO Defendant served on the boards of the Fund's portfolio companies, earning for himself additional director compensation while

simultaneously earning an annual advisory fee of 1.5% of the Net Asset Value ("NAV") of the Fund. The greater the NAV, the higher the advisory fee.

4.     The Fund told investors such as Plaintiff that the fair value of its investments would be determined in good faith by the Adviser in accordance with the Fund's fair valuation policy and procedures. The Fund was legally required to publicly report its NAV and to ***accurately*** value its investment assets. If market quotations were not readily available, securities would be valued at "fair values as determined in good faith by the Board of Trustees" which had been delegated the "day-to-day responsibility for determining fair values, in accordance with the policies it ha[d] approved, to the Fair Value Committee, subject to the Valuation Committee and ultimately the Board oversight." The Fair Value Committee was responsible for providing the Board periodic reports, no less frequently than every quarter, and to identify issues and valuation problems that have arisen, if any.

5.     By every account, the Fair Value Committee and the Valuation Committee ("Committees") failed in their obligations as they continuously and repeatedly approved quarterly valuations without sufficient, reliable evidence to support them. On the contrary, the operations and financial trajectory of the portfolio companies were in steady, persistent decline throughout the Class Period; yet, the Fund's NAV reflected a steady portfolio, which was simply untrue.

6.     With each quarter, the portfolio companies fell deeper into financial distress, while the Fund and Adviser Defendants made materially false and misleading representations about the performance, value and future prospects of the portfolio companies. For example, several of the Fund's largest investments were in companies that had questionable going concern value without a material monthly cash infusion by the Fund. These monthly payments secured by the Adviser

Defendants propped up these portfolio companies and, in turn, artificially propped up the NAV of the Fund.

7.     Although the Fund invested in private company debt and equity, it had access to ample information about the portfolio companies by virtue of the CEO Defendant serving on many of the boards of the portfolio companies and by virtue of the portfolio companies' reporting obligations to the Funds. Thus, the Fund should have used that information, along with generally accepted valuation methodologies, to accurately value the Fund's investments.

8.     On June 29, 2023, the Fund announced that, based upon the recommendation of the Adviser, the Fund's Board of Trustees had approved a plan of liquidation for the Fund (the "Liquidation Plan"). The Adviser Defendants reassured investors that there were no issues with the underlying investments held by the Fund and the Fund continued trading at or around a NAV of $10 per share.  The reason for the liquidation stemmed from the loss of certain tax advantages.

9.     On November 1, 2023, Daniel and Carol Wildermuth resigned from the Board and from their roles as officers of the Fund. Daniel Wildermuth further resigned as Chairman of the Board and the agreement with the Adviser was terminated. The Board replaced Wildermuth Advisory with BW Asset Management Ltd. ("BWAM"), a subsidiary of Kroll, as the Fund's investment adviser.

10.     Kroll's subsequent valuation of the Fund's investments told a completely different story than the Fund's prior annual reports and other public disclosures.  BWAM reported that the Fund's NAV had declined largely due to portfolio companies underperforming (i.e., failing to convert pipeline opportunities and downward trends in revenue growth). In reality, the performance of the portfolio companies across the entire Fund portfolio was lagging and

problematic throughout the Class Period, and this was known to the Fund, the Adviser Defendants, and the Fund's Chief Financial Officer, Gerard Scarpati (hereinafter, the "CFO Defendant").

11.    Compared with reported values in March 2022, by October 2024, the value of the Fund's investments had dropped by 63.6% and the NAV had declined by 73.7%. Compared to the values reported in March of 2023, by October 2024, the value of the Fund's investments had dropped by 47.4% and the NAV had declined by 57.7%, in comparison to the March 2023 valuations. Finally, by 2024, Kroll revised its NAV to less than $2.00 per share, ***an 80% reduction in NAV per share***. The Fund and the Adviser Defendants knew during the Class Period (1) the NAV was grossly overinflated and (2) they were charging the Fund excessive fees based on the grossly overinflated NAV.

12.    As a result of the undisclosed, severe underperformance of the portfolio companies, falsification of the asset values and reliance on the Adviser Defendants' false assertions about the value of the portfolio companies without sufficient, credible evidence to support it, the lack of reasonable internal financial controls and independence (including a dysfunctional Board, Fair Value Committee and Valuation Committee), rampant conflicts of interests, the Fund's financials were materially false and misleading and the NAV was grossly overstated throughout the Class Period.  In addition, the Adviser knowingly took an excessive advisory fee based on the Fund's falsely inflated NAV.

13.    Meanwhile,    throughout    the    Class    Period,    the    Fund's    auditor, WithumSmith+Brown, PC (hereinafter, the "Auditor"), knew or was reckless in not knowing the Fund and Adviser Defendants lacked credible support for the Fund's valuations of its portfolio companies yet repeatedly issued a clean, unqualified audit opinion asserting that the "financial

statements and financial highlights present fairly, in all material respects, the financial position of the [Fund]."

14.    The Auditor also falsely claimed that it had conducted its "audits in accordance with the standards of the PCAOB." However, the PCAOB fined the Auditor $2 million for violating PCAOB audit standards from at least January 2020 through April 2022[1] and found numerous instances of the Auditor's non-compliance with applicable audit standards during the PCAOB's annual inspections throughout the Class Period.

15.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class members have suffered significant losses and damages.

## II.    JURISDICTION AND VENUE

16.    The claims asserted in this complaint arise under and pursuant to (i) Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC; and (ii) Sections 36(b) and 47(b) of the 1940 Act, 15 U.S.C. §80a-35(b), 80a-47(b).

17.    This Court has jurisdiction over the subject matter of these claims pursuant to 28 U.S.C. §1331, Section 27 of the Exchange Act, and Section 43 of the 1940 Act.

18.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, Section 43 of the 1940 Act, and 28 U.S.C. §1391(b).  Defendant WithumSmith+Brown, PC is, and was during the wrongdoing alleged herein, headquartered in this District.

---

[1] PCAOB Release No. 105-2024-10, Order Insisting Disciplinary Proceedings Making Findings, and Imposing Sanctions, dated Feb. 20, 2024, available at https://assets.pcaobus.org/pcaob-dev/docs/default-source/enforcement/decisions/documents/105-2024-010-withum.pdf?sfvrsn=249bf498_2.

19.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone and wire communications, and facilities of a national securities exchange.

### III.    PARTIES

#### A.    Plaintiff

20.     Plaintiff Rochelle Cramer ("Plaintiff") has been a shareholder of the Fund since 2016 and is a resident of Florida.  Plaintiff's transactions in Fund shares during the Class Period are set forth on Schedule A.

#### B.    Defendants

21.     Defendant Wildermuth Fund is a closed-end mutual fund registered with the SEC under the 1940 Act. During the Class Period, the Fund's principal executive offices were located at 3928 3rd Street South, #89 Jacksonville Beach, FL 32250.

22.     Defendant Wildermuth Advisory, LLC was the investment adviser for the Fund from its inception until November 1, 2023.  During the Class Period,  the Adviser was located at 3928 3rd Street South, #89 Jacksonville Beach, FL 32250.

23.     Defendant Daniel Wildermuth served as President, Chief Executive Officer ("CEO"), and Chairman and Trustee of the Fund from its inception through November 1, 2023. He also served as the President and CEO of Wildermuth Advisory, LLC while it acted as the Fund's investment adviser. He resigned from his positions with the Fund and on the Board of Trustees on November 1, 2023.

24.     Defendant Gerard Scarpati is the Wildermuth Fund's treasurer and Chief Financial Officer ("CFO"). He served as the CFO during the relevant time period. Mr. Scarpati is a Certified

Public Accountant with over 25 years of experience in the financial services and investment management industry.

25.    Fund, Adviser, CEO and CFO are collectively referred to herein as the "Wildermuth Defendants."

26.    Defendant Carol Wildermuth is the spouse of Defendant Daniel Wildermuth and was a member of the Board of Trustees of the Fund from 2019 through November 1, 2023, when she resigned that position.

27.    Defendant Anthony Lewis has been a member of the Board of Trustees of the Fund since at least 2019.

28.    Defendant R. Martel Dey was a member of the Board of Trustees of the Fund from 2019 through October 12, 2021.

29.    Defendant Randall Fretz has been a member of the Board of Trustees of the Fund since at least 2019.

30.    Defendant Donald R. Henry has been a member of the Board of Trustees of the Fund since October 12, 2021.

31.    Board Trustees Daniel Wildermuth, Carol Wildermuth, Anthony Lewis, R. Martel Dey, Randall Fretz, and Donald R. Henry are collectively referred to herein as the "Trustee Defendants."

32.    Defendant WithumSmith+Brown, PC served as the Fund's outside auditor at all relevant times during the Class Period.

## IV.    FACTUAL ALLEGATIONS

### A.    Introduction To The Fund

33.     The Fund is a closed-end mutual fund registered with the SEC under the 1940 Act. During the Relevant Period, the Fund offered securities to the public. The securities were, and are, registered under the Securities Act of 1933.

34.     The 1940 Act requires mutual fund advisers to file periodic reports with the SEC, provide certain disclosures to mutual fund investors, act in the best interest of their clients, and implement strict risk management and other internal controls.

35.     The SEC also requires that all mutual funds disclose their NAV, which is calculated by dividing the total value of the cash and securities in a fund, less any liabilities, by the number of shares outstanding. The calculation of the NAV is critical to market confidence and necessary for the market to value the shares of any mutual fund.

36.     A closed-end mutual fund is a type of investment company that invests money raised from investors and is generally not required to buy its shares back from investors upon request (unlike open-end funds, which are). They may hold a greater percentage of less liquid securities in their investment portfolios. Investors in closed-end funds own shares of the mutual fund. Typically, closed-end funds are managed by an investment management firm that makes decisions regarding a fund's investment portfolio. Shares of closed-end funds are traded on an exchange, and other market participants act as buyers or sellers.

37.     During the Class Period, the Fund operated as an "interval fund." Interval funds periodically offer to repurchase a certain percentage of their shares back from shareholders. The Fund allowed for quarterly repurchasing of no less than 5% and no more than 25% of its shares outstanding. Repurchasing is done at NAV, which, as explained above, is calculated by, *inter alia*, valuing each of the Fund's investments according to different principles and methods depending

on the type of asset (i.e. publicly traded securities will be valued via a different method than private equity).

38.     In addition, until on or about October 18, 2022, the Fund was a regulated investment company ("RIC"). RICs can pass income through to investors, avoiding double taxation where both the RIC and the investors pay tax on the same income. The pass-through income allowable by RICs means that the company avoids paying corporate income taxes on profits passed on to its shareholders. The only imposed income tax is on individual shareholders.

39.     Investment companies must meet certain obligations and criteria in order to qualify as a regulated investment company. An RIC must earn at least 90% of its income from capital gains, interest, or dividends from investment. It must also distribute a minimum of 90% of its net investment income in the form of interest, dividends, or capital gains to its shareholders. Additionally, at least 50% of the company's assets must be in cash, cash equivalents, or securities.

40.     The Fund positioned itself as a unique long-term investment opportunity that modeled its investment strategy after the endowment strategy utilized by colleges, universities, and other institutions. In its original registration statement with the SEC, the Fund (then known as the Wildermuth Endowment Strategy Fund) detailed its Investment Objective and Policies as such:

> The Fund will pursue its objective by investing in assets that the Adviser believes provide favorable long-term capital appreciation and risk-adjusted return potential, as well as in income-producing assets that the Adviser believes will provide consistent income generation and liquidity. Generally, traditional endowment funds have both income-producing assets and assets selected for long-term capital appreciation, and must structure their asset allocation to achieve both these objectives. This allocation requires that the endowment seek to achieve a risk-adjusted return with lower volatility than other investment vehicles. The Fund seeks to approximate the investment strategies and asset allocation policies of traditional endowment funds through a total mix of both liquid, traditional equity and fixed income investments and less liquid, alternative and non-traditional investments.[2]

---

[2] Wildermuth Endowment Strategy Fund, Form N-2 (Dec. 17, 2014) (available at https://www.sec.gov/Archives/edgar/data/1586009/000114420414074462/v396642_n2a.htm).

41.    In its advertising materials to potential investors from 2020, the Fund stated that it "seeks to provide long-term capital appreciation and income to investors by employing investment strategies and asset allocation techniques followed by traditional endowment funds" and that the Fund "is designed to provide investments and asset classes similar to what might be found in an endowment fund."

42.    Endowment funds are most commonly seen in connection with how colleges and universities manage their money to guarantee strong returns while planning for long-term growth. The goal of an endowment investment strategy is to generate consistent long-term income while protecting investors against inflation and market risk through asset diversification and allocation. The endowment strategy favors assets with high expected returns, such as private equity, measured against investments in steadier assets such as public securities or bonds.

43.    In its Statement of Additional Information regarding the Fund's investment strategy, Wildermuth states that "the Fund's investment objective is to seek total return through a combination of long-term capital appreciation and income generation." To that end, the Fund will invest in "income-producing assets that [the Adviser] believes will provide consistent income generation and liquidity."

44.    Despite the Fund's original stated investment objective of mimicking the strategy of endowment funds, as the years passed the Fund began investing more and more heavily in private equity, which are risky investments for the individual investors to whom the Fund was marketed. Its portfolio shifted from a diversified set of investments towards near-total investment in private equity. Despite this change, the Fund did not advertise itself as a private equity fund, and while it did warn investors that private equity investments are risky, it never clearly stated that its goals were to pursue almost exclusively private equity investment.

45.    Although private equity investing may offer high returns not easily achievable through more conventional investment options, private equity investing carries additional risk due to the uncertain nature of the investments and the long investment timeline, among other factors. This risk is amplified for individual investors, such as Plaintiff and other Class members.

46.    Private equity is particularly illiquid, meaning that investors will find it difficult, if not impossible, to sell their interest in private equity and need to hold on to their investment for years to realize gains. Again, this risk is amplified for individual investors, who may not have access to additional sources of liquidity.

47.    Private equity investors also face greater market risk than traditional investors because there is no guarantee the smaller companies which private equity investors invest in will be successful or even grow at all. Investing in fledgling companies is inherently significantly riskier than investing in well-established, public companies with a track record of proven success. Thus, accurate valuations of the Fund's private equity positions were crucial for Fund investors to understand the riskiness of their investments.

48.    Throughout the Class Period, the Fund reported its valuation of its investment holdings in various filings with the SEC that were available to the Fund's investors.  As shown below, these valuations were materially false and misleading because they overstated the value of the Fund's investments.

49.    Throughout the Class Period, the Fund also reported its NAV in various filings with the SEC that were available to the Fund's investors. As explained above, the Fund's NAV was derived from the value of its investments. As shown below, these NAVs were materially false and misleading and overstated the NAV of the Fund, given that the valuation of the Fund's investments was overstated.

B.    **Misstatements Relating To The Fund's Net Asset Value**

1.    False and Misleading Statements in the March 9, 2021 FY-2020 CSR

50.    On March 9, 2021, the Fund filed an audited Certified Shareholder Report (Form N-CSR) with the SEC for the year ended December 31, 2020 ("FY-2020 CSR"), which was signed by the CEO and CFO Defendants (collectively, the "Officer Defendants").  The FY 2020 CSR reported the following NAV and Net Assets for Class A, Class C, and Class I shares:

| Net Assets: | |
| --- | --- |
| Class A | $ 76,418,348 |
| Class C | 56,451,235 |
| Class I | 28,964,681 |
| Net Assets | $161,834,264 |

51.    The FY-2020 CSR reported the following NAV for Class A, Class C, and Class I shares:

| Net Asset Value, Offering Price and Redemption Proceeds Per Share:[1] | | |
| --- | --- | --- |
| Class A | $ | 13.52 |
| Class C[2] | $ | 13.01 |
| Class I | $ | 13.60 |

52.    These statements were materially false and misleading at the time they were made because Defendants misrepresented and failed to disclose material facts relating to the valuation of the Fund's investments, which were known to the Wildermuth Defendants or recklessly disregarded by them.  Specifically, the Wildermuth Defendants (1) intentionally or recklessly miscalculated the fair value of the Fund's investments; (2) knew and/or recklessly disregarded that the Fund's Net Assets were artificially inflated; and (3) knew and/or recklessly disregarded that the NAV of the Funds was artificially inflated. The Wildermuth Defendants engaged in this misconduct in order to, among other things, conceal the true valuation of the Fund's investments from the investing public and to support the artificially inflated prices of the Fund's shares.

13

53.     Additionally, the FY-2020 CSR reported the fair value of the Fund's investments. The CSR reported that the Fund held 5,115,032 Series A Convertible Preferred Units of DSI Digital, LLC ("DSI") with a fair value of $15,511,352.  That investment represented 9.58% of the Fund's Net Assets, making it the Fund's largest investment in a single company.

54.     The reported fair value of DSI in the FY-2020 CSR was false and misleading at the time it was made because the Wildermuth Defendants misrepresented and failed to disclose material facts regarding the fair value of DSI that were known to the Wildermuth Defendants or recklessly disregarded by them. Specifically, the Wildermuth Defendants (1) intentionally or recklessly miscalculated the fair value of DSI; (2) knew and/or recklessly disregarded that the true fair value of DSI was materially lower than what was reported; and (3) failed to disclose that the Fund was providing $200,000 a month in funding to DSI to support its operations. The Wildermuth Defendants engaged in this misconduct in order to, among other things, conceal the true valuation of the Fund's investment from the investing public and to support the artificially inflated prices of the Fund's shares.

2.    False and Misleading Statements in the September 7, 2021 1H-2021 CSR

55.     On September 7, 2021, the Fund filed a Form N-CSR Certified Shareholder Report with the SEC containing unaudited financials for the period ending June 30, 2021 ("1H-2021 CSR"), which was signed by the Officer Defendants. The 1H-2021 CSR reported the following Net Assets for Class A, Class C, and Class I shares:

| Net Assets: | |
| --- | --- |
| Class A | $ 71,961,140 |
| Class C | 54,690,729 |
| Class I | 28,847,779 |
| **Net Assets** | $155,499,648 |

56.     The 1H-2021 CSR reported the following NAV for Class A, Class C, and Class I shares:

**Net Asset Value, Offering Price and Redemption Proceeds Per Share:**[1]

| | | |
|---|---|---|
| Class A | $ | 13.99 |
| Class C[2] | $ | 13.41 |
| Class I | $ | 14.09 |

57.     These statements were materially false and misleading at the time they were made because the Wildermuth Defendants misrepresented and failed to disclose material facts relating to the valuation of the Fund's investments, which were known to the Wildermuth Defendants or recklessly disregarded by them. Specifically, the Wildermuth Defendants (1) intentionally or recklessly miscalculated the fair value of the Fund's investments; (2) knew and/or recklessly disregarded that the Fund's Net Assets were artificially inflated; and (3) knew and/or recklessly disregarded that the NAV of the Funds was artificially inflated. The Wildermuth Defendants engaged in this misconduct in order to, among other things, conceal the true valuation of the Fund's investments from the investing public and to support the artificially inflated prices of the Fund's shares.

58.     Additionally, the 1H-2021 CSR reported the fair value of the Fund's investments. The CSR reported that the Fund held 5,791,621 Series A Convertible Preferred Units of DSI with a fair value of $16,864,225, and 1,064,111 Common Units of DSI with a fair value of $2,603,256. These investments represented 12.52% of the Fund's Net Assets, making it the Fund's largest investment in a single company.

59.     The reported fair value of DSI in the 1H-2021 CSR was false and misleading at the time it was made because the Wildermuth Defendants misrepresented and failed to disclose material facts regarding the fair value of DSI that were known to the Wildermuth Defendants or

recklessly disregarded by them. Specifically, the Wildermuth Defendants (1) intentionally or recklessly miscalculated the fair value of DSI; (2) knew and/or recklessly disregarded that the true fair value of DSI was materially lower than what was reported; and (3) failed to disclose that the Fund was providing $200,000 a month in funding to DSI to support its operations. The Wildermuth Defendants engaged in this misconduct to, among other things, conceal the true valuation of the Fund's investment from the investing public and to support the artificially inflated prices of the Fund's shares.

3.   False and Misleading Statements in the March 10, 2022 FY-2021 CSR

60.   On March 10, 2022, the Fund filed an audited Form N-CSR Certified Shareholder Report with the SEC for the year ended December 31, 2021 ("FY-2021 CSR"), which was signed by the Officer Defendants.  The FY-2021 CSR reported the following Net Assets for Class A, Class C, and Class I shares:

| Net Assets: | |
| --- | --- |
| Class A | 62,554,661 |
| Class C | 52,299,164 |
| Class I | 29,255,010 |
| Net Assets | $144,108,835 |

61.   The FY-2021 CSR also reported the following NAV for Class A, Class C, and Class I shares:

| Net Asset Value, Offering Price and Redemption Proceeds Per Share:(1) | | |
| --- | --- | --- |
| Class A | $ | 13.51 |
| Class C(2) | | 12.86 |
| Class I | | 13.62 |

62.   These statements were materially false and misleading at the time they were made because the Wildermuth Defendants misrepresented and failed to disclose material facts relating to the valuation of the Fund's investments, which were known to the Wildermuth Defendants or

16

recklessly disregarded by them. Specifically, the Wildermuth Defendants (1) intentionally or recklessly miscalculated the fair value of the Fund's investments; (2) knew and/or recklessly disregarded that the Fund's Net Assets were artificially inflated; and (3) knew and/or recklessly disregarded that the NAV of the Funds was artificially inflated. The Wildermuth Defendants engaged in this misconduct in order to, among other things, conceal the true valuation of the Fund's investments from the investing public and to support the artificially inflated prices of the Fund's shares.

63.    Additionally, the FY 2021 CSR reported the fair value of the Fund's investments. The FY-2021 CSR reported that the Fund held 5,791,621 Series A Convertible Preferred Units of DSI with a fair value of $10,243,242, and 2,074,115 Common Units of DSI with a fair value of $3,038,110. These investments represented 9.22% of the Fund's Net Assets, making it one of the Fund's largest investments in a single company.

64.    The reported fair value of DSI in the FY-2021 CSR was false and misleading at the time it was made because the Wildermuth Defendants misrepresented and failed to disclose material facts regarding the fair value of DSI that were known to the Wildermuth Defendants or recklessly disregarded by them. Specifically, the Wildermuth Defendants (1) intentionally or recklessly miscalculated the fair value of DSI; (2) knew and/or recklessly disregarded that the true fair value of DSI was materially lower than what was reported; and (3) failed to disclose that the Fund was providing $200,000 a month in funding to DSI to support its operations. The Wildermuth Defendants engaged in this misconduct in order to, among other things, conceal the true valuation of the Fund's investment from the investing public and to support the artificially inflated prices of the Fund's shares.

65.    The FY-2021 CSR also reported that the Fund held 8,800,00 Common Units of Reach Enterprises, Inc. ("Reach") with a fair value of $6,542,106; 309,150 Series Seed-1 Preferred Units with a fair value of $336,618; and 1,288,103 Series Seed-2 Preferred Units with a fair value of $1,402,551.  These investments represented 5.74% of the Fund's Net Assets, making it one of the Fund's largest investments in a single company.

66.    The reported fair value of Reach in the FY-2021 CSR was false and misleading at the time it was made because the Wildermuth Defendants misrepresented and failed to disclose material facts regarding the fair value of Reach that were known to the Wildermuth Defendants or recklessly disregarded by them.  Specifically, the Wildermuth Defendants (1) intentionally or recklessly miscalculated the fair value of Reach; (2) knew and/or recklessly disregarded that the true fair value of Reach was materially lower than what was reported; and (3) failed to disclose that that the Fund was providing between $100,000 and $200,000 a month in funding to Reach to support its operations.  The Wildermuth Defendants engaged in this misconduct in order to, among other things, conceal the true valuation of the Fund's investment from the investing public and to support the artificially inflated prices of the Fund's shares.

4.    <u>False and Misleading Statements in the March 31, 2022 CSR</u>

67.    On June 9, 2022, the Fund filed a Form N-CSR Certified Shareholder Report with the SEC containing audited financials for the period ending March 31, 2022 ("March 31, 2022 CSR"), which was signed by the Officer Defendants.  The March 31, 2022 CSR reported the following Net Assets for Class A, Class C, and Class I shares:

| Net Assets: | |
|---|---:|
| Class A | 59,090,789 |
| Class C | 51,627,231 |
| Class I | 28,959,760 |
| Net Assets | $139,677,780 |

68. The March 31, 2022 CSR also reported the following NAV for Class A, Class C, and Class I shares:

| Net Asset Value, Offering Price and Redemption Proceeds Per Share:[1] | |
|---|---|
| Class A | $    13.67 |
| Class C[2] | 13.00 |
| Class I | 13.80 |

69. These statements were materially false and misleading at the time they were made because the Wildermuth Defendants misrepresented and failed to disclose material facts relating to the valuation of the Fund's investments, which were known to the Wildermuth Defendants or recklessly disregarded by them. Specifically, the Wildermuth Defendants (1) intentionally or recklessly miscalculated the fair value of the Fund's investments; (2) knew and/or recklessly disregarded that the Fund's Net Assets were artificially inflated; and (3) knew and/or recklessly disregarded that the NAV of the Funds was artificially inflated. The Wildermuth Defendants engaged in this misconduct in order to, among other things, conceal the true valuation of the Fund's investments from the investing public and to support the artificially inflated prices of the Fund's shares.

70. Additionally, the March 31, 2022 CSR reported the fair value of the Fund's investments. The CSR reported that the Fund held 5,791,621 Series A Convertible Preferred Units of DSI with a fair value of $10,554,178, and 2,074,115 Common Units of DSI with a fair value of $3,169,466. These investments represented 9.82% of the Fund's Net Assets, making it one of the Fund's largest investments in a single company.

71. The reported fair value of DSI in the March 31, 2022 CSR was false and misleading at the time it was made because the Wildermuth Defendants misrepresented and failed to disclose material facts regarding the fair value of DSI that were known to the Wildermuth Defendants or

recklessly disregarded by them. Specifically, the Wildermuth Defendants (1) intentionally or recklessly miscalculated the fair value of DSI; (2) knew and/or recklessly disregarded that the true fair value of DSI was materially lower than what was reported; and (3) failed to disclose that the Fund was providing $200,000 a month in funding to DSI to support its operations. The Wildermuth Defendants engaged in this misconduct in order to, among other things, conceal the true valuation of the Fund's investment from the investing public and to support the artificially inflated prices of the Fund's shares.

72.    The March 31, 2022 CSR also reported that the Fund held 8,800,00 Common Units of Reach with a fair value of $6,083,101; 309,150 Series Seed-1 Preferred Units with a fair value of $316,982; and 1,288,103 Series Seed-2 Preferred Units with a fair value of $1,320,735. These investments represented 5.54% of the Fund's Net Assets, making it one of the Fund's largest investments in a single company.

73.    The reported fair value of Reach in the March 31, 2022 CSR was false and misleading at the time it was made because the Wildermuth Defendants misrepresented and failed to disclose material facts regarding the fair value of Reach that were known to the Wildermuth Defendants or recklessly disregarded by them. Specifically, the Wildermuth Defendants (1) intentionally or recklessly miscalculated the fair value of Reach; (2) knew and/or recklessly disregarded that the true fair value of Reach was materially lower than what was reported; and (3) failed to disclose that the Fund was providing between $100,000 and $200,000 a month in funding to Reach to support its operations. The Wildermuth Defendants engaged in this misconduct in order to, among other things, conceal the true valuation of the Fund's investment from the investing public and to support the artificially inflated prices of the Fund's shares.

5.   False and Misleading Statements in the September 30, 2022 CSR

74.     On December 8, 2022, the Fund filed a Form N-CSR Certified Shareholder Report with the SEC containing unaudited financials for the period ending September 30, 2022 ("September 30, 2022 CSR"), which was signed by the Officer Defendants.  The September 30, 2022 CSR reported the following Net Assets for Class A, Class C, and Class I shares:

| Net Assets: | |
|---|---|
| Class A | 49,126,740 |
| Class C | 46,483,817 |
| Class I | 29,153,240 |
| **Net Assets** | $124,763,797 |

75.     The September 30, 2022 CSR also reported the following NAV for Class A, Class C, and Class I shares:

| Net Asset Value, Offering Price and Redemption Proceeds Per Share:[1] | | |
|---|---|---|
| **Class A** | $ | 13.41 |
| **Class C**[2] | | 12.69 |
| **Class I** | | 13.55 |

76.     These statements were materially false and misleading at the time they were made because the Wildermuth Defendants misrepresented and failed to disclose material facts relating to the valuation of the Fund's investments, which were known to the Wildermuth Defendants or recklessly disregarded by them.  Specifically, the Wildermuth Defendants (1) intentionally or recklessly miscalculated the fair value of the Fund's investments; (2) knew and/or recklessly disregarded that the Fund's Net Assets were artificially inflated; and (3) knew and/or recklessly disregarded that the NAV of the Funds was artificially inflated.  The Wildermuth Defendants engaged in this misconduct in order to, among other things, conceal the true valuation of the Fund's investments from the investing public and to support the artificially inflated prices of the Fund's shares.

77.     Additionally, the September 30, 2022 CSR reported the fair value of the Fund's investments.  The CSR reported that the Fund held 5,791,621 Series A Convertible Preferred Units of DSI with a fair value of $10,554,178, and 2,074,115 Common Units of DSI with a fair value of $3,169,466.  These investments represented 11.0% of the Fund's Net Assets, making it one of the Fund's largest investments in a single company.

78.     The reported fair value of DSI in the September 30, 2022 CSR was false and misleading at the time it was made because the Wildermuth Defendants misrepresented and failed to disclose material facts regarding the fair value of DSI that were known to the Wildermuth Defendants or recklessly disregarded by them.   Specifically, the Wildermuth Defendants (1) intentionally or recklessly miscalculated the fair value of DSI; (2) knew and/or recklessly disregarded that the true fair value of DSI was materially lower than what was reported; and (2) failed to disclose that the Fund was providing $200,000 a month in funding to DSI to support its operations.  The Wildermuth Defendants engaged in this misconduct in order to, among other things, conceal the true valuation of the Fund's investment from the investing public and to support the artificially inflated prices of the Fund's shares.

79.     The September 30, 2022 CSR also reported that the Fund held 8,800,00 Common Units of Reach with a fair value of $6,083,101; 309,150 Series Seed-1 Preferred Units with a fair value of $316,982; and 1,288,103 Series Seed-2 Preferred Units with a fair value of $1,320,735.  These investments represented 6.19% of the Fund's Net Assets, making it one of the Fund's largest investments in a single company.

80.     The reported fair value of Reach in the September 30, 2022 CSR was false and misleading at the time it was made because the Wildermuth Defendants misrepresented and failed to disclose material facts regarding the fair value of Reach that were known to the Wildermuth

Defendants or recklessly disregarded by them.  Specifically, the Wildermuth Defendants (1) intentionally or recklessly miscalculated the fair value of Reach; (2) knew and/or recklessly disregarded that the true fair value of Reach was materially lower than what was reported; and (3) failed to disclose that the Fund was providing between $100,000 and $200,000 a month in funding to Reach to support its operations. The Wildermuth Defendants engaged in this misconduct in order to, among other things, conceal the true valuation of the Fund's investment from the investing public and to support the artificially inflated prices of the Fund's shares.

6.    False and Misleading Statements in the March 31, 2023 CSR

81.    On June 9, 2023, the Fund filed an audited Form N-CSR Certified Shareholder Report with the SEC containing financials for the period ending March 31, 2023 ("March 31, 2023 CSR"), which was signed by the Officer Defendants.  The March 31, 2023 CSR reported the following Net Assets for Class A, Class C, and Class I shares:

| Net Assets: | |
|---|---|
| Class A | 29,941,219 |
| Class C | 15,816,406 |
| Class I | 40,899,774 |
| Net Assets | $ 86,657,399 |

82.    The March 31, 2023 CSR also reported the following NAV for Class A, Class C, and Class I shares:

| Net Asset Value, Offering Price and Redemption Proceeds Per Share:[1] | |
|---|---|
| Class A | $    9.90 |
| Class C[2] | 9.20 |
| Class I | 10.04 |

83.    These statements were materially false and misleading at the time they were made because the Wildermuth Defendants misrepresented and failed to disclose material facts relating

to the valuation of the Fund's investments, which were known to the Wildermuth Defendants or recklessly disregarded by them. Specifically, the Wildermuth Defendants (1) intentionally or recklessly miscalculated the fair value of the Fund's investments; (2) knew and/or recklessly disregarded that the Fund's Net Assets were artificially inflated; and (3) knew and/or recklessly disregarded that the NAV of the Funds was artificially inflated. The Wildermuth Defendants engaged in this misconduct in order to, among other things, conceal the true valuation of the Fund's investments from the investing public and to support the artificially inflated prices of the Fund's shares.

84. Additionally, the March 31, 2023 CSR reported the fair value of the Fund's investments. The CSR reported that the Fund held 5,791,621 Series A Convertible Preferred Units of DSI with a fair value of $7,418,808 , and 2,074,115 Common Units of DSI with a fair value of $1,566,913. These investments represented 10.4% of the Fund's Net Assets, making it one of the Fund's largest investments in a single company.

85. The reported fair value of DSI in the March 31, 2023 CSR was false and misleading at the time it was made because the Wildermuth Defendants misrepresented and failed to disclose material facts regarding the fair value of DSI that were known to the Wildermuth Defendants or recklessly disregarded by them. Specifically, the Wildermuth Defendants (1) intentionally or recklessly miscalculated the fair value of DSI; (2) knew and/or recklessly disregarded that the true fair value of DSI was materially lower than what was reported; and (3) failed to disclose that the Fund was providing $200,000 a month in funding to DSI to support its operations. The Wildermuth Defendants engaged in this misconduct in order to, among other things, conceal the true valuation of the Fund's investment from the investing public and to support the artificially inflated prices of the Fund's shares.

86.    On March 31, 2023 the Fund presented its annual financial report to shareholders covering the twelve months from April 1, 2022 to March 31, 2023 (the "FY2023 Report"). The Fund announced returns of -25.64%, -27.23%, and -25.23% for its Class A, Class C, and Class I shares respectively. In his letter to shareholders included in the financial report, the CEO Defendant stated that the "overall return of the Fund was down for the past twelve months due to multiple adjustments up and down to values within the portfolio" but claimed that "the primary driver was the recent valuation adjustment to our positions in Clearsense, LLC."

87.    The FY 2023 Report reported a net depreciation in the Fund's investments in direct private equity of $21,460,852. As of April 1, 2022, the Fund's investment in two series of Clearsense, LLC preferred shares was valued at $17,248,345, but by March 31, 2023, the combined value of both investments totaled $8,804,356, showing a depreciation to the Fund of $8,443,989. The depreciation to the Fund's direct private equity investments attributable to the diminution of the value of Clearsense, LLC was substantial, but certainly not enough to explain the entirety of the over $21 million depreciation to the Fund.

### C.    The Concealed Risks Materialized And Damaged Investors

88.    As the Fund became comprised of largely illiquid investments, primarily private equity, it was unable to sustain productive dividends for shareholders. On October 18, 2022, due at least in part to the change in the Fund's investment portfolio, the Fund announced that it no longer qualified as an RIC.

89.    On June 29, 2023, less than a year after announcing it no longer qualified as an RIC, the Fund informed shareholders and the SEC that the Fund's Board of Trustees (the "Board"), based on the recommendation of the Adviser, had approved the Liquidation Plan. In its filing with the SEC announcing the Fund's dissolution and the Liquidation Plan, the Fund stated that "the

Board concluded that it would be advisable and in the best interest of the Fund and its shareholders that the Fund be closed and liquidated."

90.    Fund liquidations occur when an investment fund winds down its operations, liquidates its assets, and generally distributes substantially all its assets in cash to its shareholders after satisfying liabilities. A fund may be liquidated for a variety of reasons, including poor performance, a decline in assets under management, or lack of investor interest.

91.    On June 30, 2023, the Fund issued a letter to shareholders informing them of the Fund's plan to liquidate. The June 30th letter stated:

> Based on a variety of factors, including a decline in assets under management, lack of investor interest, market conditions, including liquidity, the recommendation of the Adviser, adviser and sponsor of the Fund, and other relevant information, the Board determined that it is in the best interests of the Fund and its shareholders to liquidate and close the Fund.
>
> We believe these decisions increase our ability to provide transparency during the process of winding down the operations of the Fund, and more importantly, continue to seek to protect investor capital. While the Fund is in the process of being liquidated, shareholders will continue to be able to see their positions in the Fund on their statements with updated weekly net asset values and the total value of their investment. Going forward, the Adviser will:
>
>   (i)    strike a weekly NAV;
>   (ii)   distribute all regular quarterly shareholder reports with full portfolio transparency;
>   (iii)  report periodically on the progress of the liquidation to shareholders;
>   (iv)   make periodic distributions of excess cash;
>   (v)    maintain a Fund website, an investor services email address and a toll-free number for shareholder communications; and
>   (vi)   conduct a final audit upon completion of the liquidation.

92.    Following the Board's adoption of the Plan, the Fund ceased pursuing its investment objectives and the Adviser was required to begin liquidating the Fund's portfolio. Because of the illiquid nature of the Fund's assets, the liquidation may take years before it is completed.

93.     On August 1, 2023, the Fund issued another letter to shareholders, apprising them of the status of the liquidation. The letter stated:

> We would like to reiterate our commitment to attempting to maximize the value of the Fund's remaining positions and returning capital to you in as timely a manner as possible. Due to the nature of the Fund's positions, mostly early-stage private equity companies, it will take an undetermined amount of time to liquidate the Fund. Our portfolio management team is actively engaged with the Fund's portfolio companies to attempt to obtain value for our shareholders from the Fund's remaining investments. However, there are no assurances that the portfolio management team will be successful, and the Fund may lose money on these investments, including the possible loss of the entire principal amount invested. We will keep you updated on our liquidation efforts as we proceed.

94.     After the Fund announced it would begin liquidating its assets,  the Adviser stepped down as investment adviser on November 1, 2023. On the same day, BWAM, a subsidiary of Kroll, took over as investment adviser.

95.     The majority of the Fund's assets are investments in private equity. Private equity is illiquid, meaning there is not a reliable market for the purchase and sale of stock. Therefore, it is difficult to divest investments in private equity and liquidation may take months or years as compared to an investment fund with primarily liquid investments.

96.     Upon being appointed investment adviser, BWAM communicated with the Fund's underlying portfolio companies (i.e. the private equity companies the Fund was invested in at the time it announced the liquidation) in order to understand potential exit strategies and timelines, including how to commence a sale process for certain private equity investments, explored how to sell the Fund's investments with various brokers, and independently determined the fair value for all of the Fund's positions as of September 30, 2023.

97.     As BWAM undertook a review of the Fund's assets, it determined that the fair values of several of the Fund's investments were lower than previously calculated. Kroll and

BWAM identified several factors that led to the reduced valuations and presented its findings to Wildermuth investors on December 19, 2023.

98.    In total, BWAM concluded that the fair value of the Fund's investments in private equity as of September 30, 2023 was approximately 29% lower than determined by the Adviser as of June 30, 2023. This change in the value of the Fund's investments is shown in the below chart titled "Material Movements by Investment" comparing the Fund's investment value from June 30, 2023 to September 30, 2023:

**Material Movements by Investment**

| Investment | 06/30/23 Value (US$) | Change in Carrying Value (US$) | 09/30/23 Value (US$) | Change (%) |
|---|---|---|---|---|
| DSI | 17,500,512 | (6,231,980) | 11,268,532 | -36% |
| Clearsense | 8,804,356 | (3,592,209) | 5,212,147 | -41% |
| Waratek | 15,838,502 | (2,215,075) | 13,623,427 | -14% |
| WG Pitts | 1,755,852 | (638,054) | 1,117,798 | -36% |
| Total | 43,899,222 | (12,677,318) | 43,441,181 | -29% |
| Remaining Total Investments | 53,664,235 | 508,582 | 43,441,181 | 1% |
| Total Investments | 97,563,457 | (12,168,736) | 85,394,721 | -12% |

99.    The substantial change in the value of the Fund's investment in private equity was entirely responsible for the Fund's total change in investment value, which BWAM determined had decreased by 12% between June 30, 2023 and September 30, 2023. BWAM attributed these specific declines to the following driving factors:

    a.    Portfolio companies having difficulty converting pipeline opportunities;

    b.    Downward trends in revenue growth of underlying investments;

    c.    Portfolio company cashflow constraints and missed milestones.

100.    On December 10, 2024, Kroll and BWAM presented new findings to shareholders reflecting that investment values were further trending downward during 2024. Of particular note, investment valuations in DSI, Reach, and Clearsense were further significantly reduced:

## Investment Overview

Set out below is a reconciliation between the fair values of the Fund's investments as at 31 December 2024 and 31 October 2024:

| Investment Name | Value 31 December 2023 (USD) | Value 31 March 2024 (USD) | Value 30 June 2024 (USD) | Value 31 October 2024 (USD) | Change of Value (USD) |
|---|---|---|---|---|---|
| DSI Vizz | 11,666,292 | 10,259,928 | 733,972 | 733,972 | (10,932,320) |
| Reach | 10,085,012 | 1,798,000 | 500,000 | 507,659 | (9,577,353) |
| Clearsense | 5,212,147 | 308,000 | 308,000 | 308,000 | (4,904,147) |
| Atlas Fintech | 2,688,310 | 2,688,310 | 1,520,042 | 1,520,042 | (1,168,268) |
| Workshop | 2,259,984 | 2,494,990 | 1,451,790 | 1,451,790 | (808,194) |
| LaGrange Senior | 1,336,857 | 1,080,994 | 539,552 | 539,552 | (797,305) |
| WG Pitts | 1,117,798 | 471,919 | 471,919 | 471,919 | (645,879) |
| Sequin AR | 1,540,500 | 1,134,730 | 1,083,763 | 1,083,763 | (456,737) |
| Waratek | 14,214,642 | 16,750,000 | 16,294,624 | 13,972,316 | (242,326) |
| Affinity Beverage | 174,999 | 174,999 | 174,999 | 174,999 | – |
| Level ATI | 4,324,396 | 4,324,396 | 4,324,396 | 4,324,396 | – |
| Thunder Investment | 1,635,388 | 1,657,629 | 1,650,369 | 1,650,369 | 14,981 |
| Metro | 3,745,060 | 4,271,000 | 4,271,000 | 4,271,000 | 525,940 |
| Clear Guide Medical | 9,494,583 | 12,980,000 | 12,980,000 | 12,692,000 | 3,197,417 |
| Subtotal PE investments | 69,495,968 | 60,394,895 | 46,304,426 | 43,701,777 | (25,794,191) |
| | | | | | |
| LP Positions | 15,546,525 | 8,301,676 | 7,711,080 | 6,143,494 | (9,403,031) |
| Total Assets | 85,042,493 | 68,696,571 | 54,015,506 | 49,845,271 | (35,197,222) |
| Net Asset Value | 72,149,373 | | | 36,689,475 | (35,459,898) |
| NAV Per share | 8.71 | | | 4.43 | (4.28) |

101. In connection with the declines in value shown above, BWAM provided explanations for certain investments' precipitous declines in value.

102. BWAM provided background on the Fund's investment with DSI Digital ("DSI Vizz" in the above chart at ¶ 100), the investment value of which fell nearly $11,000,000 between December 31, 2023 and October 31, 2024. According to BWAM, the Fund had provided monthly funding to DSI "in order [for DSI] to continue operations" and BWAM received requests to fund $200,000 per month to DSI. Because the Fund was unable to meet this funding requirement, BWAM determined the need for a sale of DSI. Sale agreements with a purchaser for $4 million are currently under negotiation. The updated valuation of DSI reflects the estimated recovery from the sale process.

103. BWAM noted that the "considerable" drop in valuation of nearly $11 million was primarily due to DSI providing a forecast to the Adviser indicating $5.9 million in revenue during

fiscal year 2024. The forecast was dependent on two contracts that never materialized, and the updated revenue forecast for fiscal year 2024 was $0.7 million. Essentially, the valuation depended on contracts that did not actually exist at the time of the forecast.

104.    DSI's ongoing dependency on the Fund for cash reflects an inability to pay debt. DSI was unable historically to meet revenue forecasts and reliably drive revenue nor meet its operational costs quarter after quarter, yet, despite these problems, the Wildermuth Defendants continued valuing the Fund's interest in DSI as of the date of its initial investment. As a result, the Wildermuth Defendants knowingly maintained its valuation on this interest at an artificially inflated NAV.  Indeed, upon information and belief, none of the Defendants presented any evidence or support for DSI's forecasted revenues.

105.    With respect to the Fund's investment in Reach Enterprises, Inc. ("Reach"), BWAM concluded that between December 31, 2023 and October 31, 2024, the value of the Fund's investment fell by more than $9.5 million.

106.    Prior to BWAM's appointment as investment adviser, the Fund provided monthly funding to Reach in order to "continue operations". Following BWAM's appointment, Reach requested continued funding of between $100,000 and $200,000 a month. Following conversations with Reach management regarding "a number of opportunities and potential contracts" in the company's pipeline, BWAM determined that these contracts had been in the 'pipeline' for a significant amount of time and were unlikely to lead to revenue. Moreover, Reach was "yet to secure any meaningful revenue." The Fund was invested in Reach since at least August 8, 2019 despite the lack of meaningful revenue. BWAM also found that Reach had only one customer (and that customer was not generating cashflow); that Reach would require more than $1 million in revenue to secure contracts; and that Reach was unable to secure outside sources of capital to meet

cashflow needs. The valuation for Reach prior to BWAM's appointment was based on forecasts provided by the company to the Adviser, estimating revenues of $37 million. These forecasts were likely have been based on contracts that never materialized and projects that had long since become stagnant.

107.    BWAM determined that it was not in shareholders' best interests to continue funding Reach and that the value of the company lay in its underlying technology given that "Reach had no revenue and had failed its proof of concept". BWAM valued the technology at $1.7 million. There is currently a Letter of Intent in place reflecting an upfront purchase price of $325,000 for all Reach company assets. According to BWAM, it is "unlikely" that there will be further recoveries.

108.    Reach's ongoing dependency on the Fund for cash (and ultimately, repayment) reflects an inability to pay debt. Reach's historical inability to achieve forecasts and drive revenue over extended periods calls into question the reasonableness of the outdated opportunities and projections, especially if the company had never been able to generate revenue. In addition, it appears that Reach did not have tangible support for its forecasted revenues.

109.    With respect to the Fund's investment in Clearsense, Inc. ("Clearsense"), BWAM concluded that between December 31, 2023 and October 31, 2024, the value of the Fund's investment fell just over $4.9 million.

110.    The Fund was an early investor in Clearsense and had made several investments through the years. Through its investigation of the Fund's investment in Clearsense, BWAM found that while the company had contracts and revenue—unlike several of the other private companies the Fund was invested in—it continued to be "loss-making."

111.    Prior to BWAM's appointment, Clearsense entered into a funding round during which two new large institutional investors committed approximately $40 million, reducing the Fund's influence within the company. Despite this significant influx of capital, Clearsense remained loss-making through the first quarter of 2024 and commenced another funding round to raise an additional $15 million. Because of the ongoing liquidation, the Fund was unable to commit the $1.6 million required to participate in the funding round and the Fund's holding in Clearsense was converted to common stock.

112.    BWAM concluded that the only viable option for the Fund was to accept the conversion, and as a result of that conversion to common stock, the value of the Fund's investment in Clearsense dropped to just over $300,000 from its previous value of just over $5 million.

113.    Upon information and belief, the value of the Fund's investments in Clearsense were misstated in the FY 2023 and FY 2022 Reports given the company's ongoing operational problems and Clearsense's ongoing dependency on the undisclosed cash infusions made by the Fund. These material omissions and its ongoing historical inability to achieve forecasted profitability demonstrates that the forecasts used to establish previous values relied upon by Plaintiff and the other members of the Class were unreliable and misleading.

114.    Strikingly, in its letter to shareholders in the FY 2023 Report, the Fund and the CEO Defendant claimed that additional rounds of funding in Clearsense lead to the loss in the Fund's investment value and was the "primary down driver" for the downward adjustment of the Fund's NAV that year. But neither the letter nor the FY 2023 Report disclosed Clearsense's ongoing operational failures or the Fund's ongoing, persistent need to infuse it with capital. Meanwhile, the CEO Defendant reassured investors that "[Clearsense] is positioned well for continued success,"

knowing this was false and, but for the ongoing capital infusions, Clearsense was not a going concern.

115.    In total, BWAM determined that between December 31, 2023 and October 31, 2024, the value of the Fund's investments in private equity plummeted by nearly $26 million. This drop in value was the lead cause of the nearly 50% reduction in the Fund's NAV per share from $8.71 to $4.43. Upon information and belief, the conditions leading to BWAM's reduction in the Fund's NAV were extant prior to the liquidation and the NAV reported by the Fund in 2023 and 2022 did not reflect the actual value of the Fund's investments in private equity. Plaintiff and the Class were harmed by the drop in the value of the Fund's NAV.

### D.    Audit Failures Led to Material Misrepresentations and Omissions

116.    The Auditor has served as the external auditor of the Fund since 2020, including during the Class Period.

117.    During all audits during the Class Period, the Auditor repeatedly opined that the financial statements and financial highlights presented fairly, in all material respects, the financial position of the Fund and the results of its operations and statements of changes in net assets and financial highlights in conformity with generally accepted accounting principles ("GAAP"). The Auditor further asserted that it conducted the Audits in accordance with the standards of the Public Company Accounting Oversight Board ("PCAOB").

118.    The PCAOB was created under the Sarbanes-Oxley Act of 2002 and its stated mission is "to protect the interests of investors and further the public interest in the preparation of informative, accurate, and independent audit reports." To achieve this objective, the PCAOB was given responsibility to establish professional auditing standards applicable to the audits of public issuers. The Auditor, like all auditors of public issuers, is required by PCAOB Rules to follow the auditing standards adopted by the SEC and PCAOB.

119.    Although the management of the Fund assumes responsibility for the Fund's financial statements submitted to the SEC, the Auditor's primary objective during the audits throughout the Class Period under PCAOB Auditing Standards is the expression of an opinion of fairness with which the financial statements present, in all material respects, the financial position, results of operations, and the cash flows, in conformity with an acceptable, applicable financial reporting framework.

120.    To achieve this objective, the Auditor was required to plan and perform audit procedures to obtain "reasonable" or a "high level" of assurance about whether the Fund's financial statements were free of material misstatement, including misstatements resulting from fraud. However, fraud on the part of the Fund or its directors would not mitigate failure by the Auditor to comply with relevant auditing standards. PCAOB Auditing Standards expressly contemplate fraud risks and required the Auditor to identify, assess, and respond to "fraud risks" that could materially impact the Fund's financial statements. This responsibility includes obtaining sufficient appropriate evidence "to determine whether the financial statements are materially misstated rather than merely looking for evidence that supports management's assertions."

121.    The Auditor was required to respond to risks of material misstatement at both the "financial statement" level and the "assertion" level.  "Assertion" level risk assessments pertain to assertions implicitly or explicitly made by the Fund's management in representing that the Fund's financial statements are fairly presented in accordance with GAAP. Valuations are a category of assertion, and the Auditor was responsible for ensuring that the asset and liability breakdown included in the Fund's financial statements were not at risk of material misstatements.

122.    In areas of higher risk such as the valuation of investments for which market quotations are not readily available, auditors should apply professional skepticism and focus on

obtaining evidence that is more persuasive, more relevant and more reliable, such as evidence obtained directly from the private companies and evidence obtained from independent, knowledgeable sources. This is of particular note when considering the Fund's investment concentration in private equity, an area where market quotations are not readily or publicly available.

123.    Professional skepticism is a critical tool in an auditor's kit because it can result in the identification of contradictory and inconsistent information, in addition to outright falsehoods. Inconsistencies may give rise to questions as to the reasonableness of a company's assertions or the reliability of the evidence for such assertions. The Auditor's responsibility to apply requisite professional due care and related professional skepticism was essential to the performance of an effective audit.

124.    To identify and assess risks of material misstatement related to the fair value of financial instruments, including the Fund's reported investments measured at fair value, the Auditor was required to obtain an understanding of the nature of the investments being valued. Irrespective of the valuation testing approach, PCAOB Standards required the Auditor to consider whether the Fund's valuation estimates relied on observable and unobservable inputs under GAAP. For example, when the valuation of a financial instrument includes unobservable inputs that are significant to the valuation, the Auditor was required to obtain an understanding of how unobservable inputs were determined and evaluate the reasonableness of the unobservable inputs. This could include, for example, reviewing financial statements of the private companies which the Fund invested in.

125.    PCAOB inspections and enforcement actions against the Auditor during the relevant time period reveal recurring audit deficiencies relevant to matters at issue. During its 2022

and 2021 inspections of the Auditor, the PCAOB identified deficiencies in 12 of the 15 audits (an 80% deficiency rate) and 13 of 17 audits inspected (a 76% deficiency rate), respectively. In 2022, the Auditor's deficiencies were deemed to be of such significance that the PCAOB believed "the firm, at the time it issued its audit report(s), had not obtained sufficient appropriate audit evidence to support its opinion(s) on the issuer's financial statements and/or internal control over financial reporting." Of particular relevance, the PCAOB observed the Auditor "[d]id not sufficiently test an estimate" in 8 and 9 respective audits deemed deficient during the 2022 and 2021 PCAOB inspections.

126.    In addition to the inspection report findings, a PCAOB enforcement action pertaining to professional services performed by the Auditor between January 2020 and April 2022 noted the firm's system of quality control was deficient in myriad ways, including personnel shortages, unmanageable workloads, communication breakdowns, and timeliness. In its Order Instituting Disciplinary Proceedings, Making Findings, and Imposing Sanctions, the PCAOB notes that tremendous client growth and resource constraints contributed to the deficiency findings.

127.    The Auditor failed to properly investigate material misstatements related to the Fund's NAV and investments in private equity during the relevant time period.

## V.    CLASS ACTION ALLEGATIONS

128.    Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class, consisting of all persons and entities that purchased Wildermuth Fund (Ticker Symbols: WESFX (Class A), WEFCX (Class C), or WEIFX (Class I)) shares during the Class Period (the "Class"); and were damaged thereby. Excluded from the Class are Defendants and their families, the officers and directors of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

129.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Fund's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Defendants and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

130.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

131.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to, or in conflict with, those of the Class.

132.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

    a.    whether Defendants' acts as alleged violated Sections 10(b) and 20(a) of the Exchange Act and/or Section 36 of the 1940 Act;

    b.    whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Fund and the valuation of the Fund's investment positions;

    c.    whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

    d.    whether the Individual Defendants caused the Wildermuth Fund to issue false and misleading financial statements during the Class Period;

    e.      whether Defendants acted knowingly or recklessly in issuing false and misleading statements regarding the above subjects;

    f.      whether the NAV of the Fund during the Class Period was artificially inflated because of Defendants' conduct complained herein; and

    g.      whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

133.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

134.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

135.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in management of this action as a class action.

136.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

    a.      Defendants made public misrepresentations or failed to disclose material facts during the Class Period

    b.      the omissions and misrepresentations were material;

    c.      the Fund's securities traded in an efficient market;

    d.      the Fund's shares were liquid and traded during the Class Period;

    e.      the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Fund's securities; and

    f.      Plaintiff and members of the Class purchased, acquired, and/or sold the Fund's securities between the time the Defendants failed to disclose or

misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

137.    Based upon the foregoing, Plaintiff and members of the Class are entitled to a presumption of reliance upon the integrity of the market.

138.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## VI.    UNDISCLOSED ADVERSE FACTS

139.    The market for the Fund's securities was open, well-developed, and efficient at all relevant times.  As a result of Defendants' fraudulent scheme detailed herein and the materially false and/or misleading statements, and/or failures to disclose, detailed herein, the Fund's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class, relying upon the integrity of the market price of the Fund's securities and information relating to the Fund, purchased shares in the Fund and have been damaged thereby.

140.    During the Class Period, Defendants engaged in a fraudulent scheme and materially misled the investing public, thereby inflating the price of the Fund's securities, by intentionally or recklessly overvaluing the Fund's investments and publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about the valuation of the Fund's investments as alleged herein.

141.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the

damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants engaged in a fraudulent scheme and made or caused to be made a series of materially false and/or misleading statements about the valuation of the Fund's investments. Defendants' fraudulent scheme and material misstatements and/or omissions had the effect of creating, in the market, an unrealistically positive assessment of the Fund and its financial well-being and prospects, thus causing the Fund's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing Fund shares at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed and Fund shares were frozen and the NAV of those shares dropped precipitously.

## VII.    LOSS CAUSATION

142.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

143.    During the Class Period, Plaintiff and the Class purchased Fund shares at artificially inflated prices and were damaged thereby. As a result of the revelation of Defendants' fraudulent scheme and their false and misleading statements, trading in the Fund's shares has been suspended and the Fund's NAV has dropped substantially, causing investors' losses.

## VIII.    ADDITIONAL SCIENTER ALLEGATIONS

144.    While serving as President and CEO of the Fund, Defendant Daniel Wildermuth also served as President and CEO of the Adviser. The Adviser managed the Fund's assets and was responsible for the overall allocation of the Fund's portfolio, according to the prospectuses for the Fund's Class A, C, and I shares. In determining how to allocate the Fund's portfolio and selecting investments, the Adviser "will seek to produce attractive risk-adjusted returns over time by

investing in private investments that [it] believes to be of high quality supplemented by an allocation to liquid publicly traded equity investments."

145.    The Adviser had total control over the Fund's investment decisions prior to the Fund's liquidation. The CEO Defendant had the opportunity to leverage his position and select what private equity investments the Fund would make.

146.    While acting as the President and CEO of both the Fund and the Adviser, Daniel Wildermuth was also a director for Waratek Inc., ClearGuide Medical, Inc., DSI Digital, Reach, and Clearsense, LLC. The Fund's investments in these companies comprised approximately 75% of its total private equity investments as of March 31, 2023, totaling nearly $40 million.  The FY 2023 Report showed that depreciation of the Fund's direct private equity investments due to the decrease in value of these five companies was $23,937,633, accounting for nearly half of the total loss in net asset value between 2022 and 2023.

147.    The five companies that the CEO Defendant served as a director for while also acting as the President and CEO of the Fund and the Adviser were identified by BWAM and Kroll as problematic investments after BWAM took over as the Fund's investment adviser.

148.    As a director, the CEO Defendant would have had access to the financial statements of the companies he was involved with. Financial information for private equity is almost never publicly available, as private companies are not required to make the same types of financial disclosures to the SEC that publicly traded companies are. However, the board of directors for a private company must have access to financial information in order to properly supervise the activities of the company and provide appropriate guidance.

149.    Despite having access to the financial statements and other nonpublic information about the performance of the companies he served as director for, the CEO Defendant did not

disclose any information about the prospects of Waratek Inc., ClearGuide Medical, Inc., DSI Digital, Reach, or Clearsense, LLC beyond reassuring shareholders in the FY 2023 Report that Clearsense, LLC (on which he blamed the bulk of the diminution of net asset value) was "positioned well for continued success." There is no mention to shareholders about the reasons for the depreciation of the other four companies that were performing badly, and no explanation for the decrease in net asset value for any other private equity the Fund was invested in. In fact, the CEO Defendant reassured shareholders that "many of the Fund's companies are making positive progress in revenue generation while executing their strategy."

150.     After BWAM took over as investment adviser, it determined that the value of the Fund's investment in several private companies was significantly lower than reported in the FY 2023 Report. Several of the largest reductions in value were related to the companies the CEO Defendant served as director for, including DSI, Reach, and Clearsense. Given the history of cash dependency and inability to generate positive revenue that BWAM uncovered for several of these companies, financial distress had been ongoing for some time. The CEO Defendant served as a director of those companies, yet he did not disclose any of these risks to shareholders beyond informing them of the general risks related to investing in private equity.

## IX.     NO SAFE HARBOR

151.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an officer of the Fund who knew that the statement was false when made.

## X.    CAUSES OF ACTION

### COUNT I

**Violations of §10(b) of the Exchange Act
and Rule 10b-5(a) and Rule 10b-5(c)**
(Against the Wildermuth Defendants and Trustee Defendants)

152.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

153.    This Count is asserted against the Wildermuth Defendants and Trustee Defendants (collectively, the "Scheme Defendants") and is based upon §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rules 10b-5(a) and 10b-5(c) promulgated thereunder by the SEC.

154.    During the Class Period, the Scheme Defendants engaged in fraudulent acts and participated in a scheme to defraud Plaintiff by use of the means or instrumentalities of interstate commerce in order to maintain artificially inflated prices for the Fund's securities.

155.    As set forth herein, the Scheme Defendants (i) employed devices, scheme, and artifices to defraud; and (ii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Fund shares during the Class Period.

156.    The Scheme Defendants' fraudulent acts in furtherance of the scheme were intended to and did: (a) deceive the investing public, including Plaintiff and the other Class members, as alleged herein; (b) artificially inflate and maintain the market for, and market prices

of, the Fund's securities; and (c) cause Plaintiff and other members of the Class to purchase or otherwise acquire the Fund's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, the Scheme Defendants, and each of them, took the actions set forth herein.

157. As part of their scheme to defraud investors in violation of Rule 10b-5(a) and (c), the Scheme Defendants, among other things, (i) intentionally or recklessly misvalued the Fund's investment holdings, thereby (ii) artificially inflating the NAV of the Fund, and (iii) concealed these actions and activities from the investing public.

158. As described above, the Scheme Defendants acted with scienter throughout the Class Period, in that they affirmatively and knowingly or with reckless disregard participated in the scheme to defraud investors. In addition, the Scheme Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Scheme Defendants engaged in this misconduct to, among other things, conceal the true valuation of the Fund's investments from the investing public and to support the artificially inflated prices of the Fund's shares.

159. During the Class Period, the Fund's shares were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein—which the Scheme Defendants made, issued, or caused to be disseminated—or relying upon the integrity of the market, purchased, or otherwise acquired the Fund's shares at prices artificially inflated by the Scheme Defendants' fraudulent course of conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities or would not have purchased or otherwise acquired

them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of the Fund's shares was substantially lower than the prices paid by Plaintiff and the other members of the Class.

160.    The market price of the Fund's shares declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.  Thus, as a direct and proximate result of the Scheme Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages attributable to the fraud alleged herein in connection with their respective purchases of the Fund's shares.

161.    By virtue of the foregoing, the Scheme Defendants violated Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) promulgated thereunder.

**COUNT II**
**Violations of §10(b) of the Exchange**
**Act and Rule 10b-5(b)**
(Against the Fund and Officer Defendants)

162.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

163.    This Count is asserted against the Fund and Officer Defendants and is based upon §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5(b) promulgated thereunder by the SEC.

164.    During the Class Period, the Fund and Officer Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

165.    The Fund and Officer Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

166.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for shares of the Fund.  Plaintiff and the Class would not have purchased shares of the Fund at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

167.    As a direct and proximate result of the Fund and Officer Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Fund shares during the Class Period.

168.    By virtue of the foregoing, the Fund and Officer Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

## COUNT III
### Violations of §20(a) of the Exchange Act
#### (Against the Adviser, Officer Defendants, and Carol Wildermuth)

169.    Plaintiff repeats and realleges each allegation contained in the foregoing paragraphs as if fully set forth herein.

170.    This Count is asserted against the Adviser, Officer Defendants, and Carol Wildermuth (in this count, collectively the "Control Person Defendants") and is based upon § 20(a) of the Exchange Act.

171.    At all relevant times, the Control Person Defendants were controlling persons within the meaning of Section 20(a) of the Exchange Act.  During the Class Period, the CEO Defendant was the Principal Executive Officer of the Fund, serving as its President and CEO, and

was also Chairman and Trustee of the Fund. He also served as the President and CEO of the Adviser. The CFO Defendant was the Principal Financial Officer of the Fund, serving as its Treasurer and CFO. The Adviser was the investment adviser for the Fund. During the Class Period, Carol Wildermuth served as CFO for the Adviser and Trustee of the Fund.

172. During the Class Period, each of the Control Person Defendants directly participated in the day-to-day operation and management of the Fund, had supervision and oversight over the Fund's business and financial affairs, administered the Fund, and directed the Fund's investment strategies and decisions. In addition, the Officer Defendants were intimately involved in preparing, reviewing, approving, and/or disseminating the contents of all public statements, communications, press releases, investor materials, financial statements, SEC filings, and other financial reports and disclosures issued by the Fund, including the materially false and misleading statements described herein.

173. Each of the Control Person Defendants were therefore controlling persons within the meaning of § 20(a) of the Exchange Act. Each of the Control Person Defendants possessed the power and authority to control and direct the actions of the Fund, and each of the Defendants exercised their power and authority to cause the Fund to engage in the unlawful conduct and wrongful acts complained of herein. In this capacity, each of the Control Person Defendants participated in the unlawful conduct alleged, which artificially inflated the prices of the Fund's shares.

174. By virtue of the foregoing, the Control Person Defendants are liable under § 20(a) for the violations committed by Defendants under § 10(a) of the Exchange Act.

**COUNT IV**
**Violations of §10(b) of the Exchange Act and**
**Rule 10b-5(a), (b), and (c)**
<u>(Against the Auditor)</u>

175.    Plaintiff repeats and realleges each allegation contained in the foregoing paragraphs as if fully set forth herein.

176.    This Count is asserted against the Auditor and is based upon §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rules 10b-5(a)-(c) promulgated thereunder by the SEC.

177.    During the Class Period, the Auditor engaged in fraudulent acts and participated in a scheme to defraud Plaintiff by use of the means or instrumentalities of interstate commerce in order to maintain artificially inflated prices for the Fund's securities.

178.    As set forth herein, the Auditor (i) employed devices, scheme, and artifices to defraud; and (ii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Fund shares during the Class Period.

179.    The Auditor's fraudulent acts in furtherance of the scheme were intended to and did: (a) deceive the investing public, including Plaintiff and the other Class members, as alleged herein; (b) artificially inflate and maintain the market for, and market prices of, the Fund's securities; and (c) cause Plaintiff and other members of the Class to purchase or otherwise acquire the Fund's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, the Auditor took the actions set forth herein.

180.    The Auditor acted as an independent auditor for the Fund from October 10, 2020 through the end of the Class Period and knew and intended for Plaintiff and other members of the Class to rely on their fraudulent acts.  The Auditor had access to the Fund's employees and continuing access to and knowledge of the Fund's confidential corporate, financial, operating and business information.  Despite this access and knowledge, the Auditor employed a deceptive device to defraud Plaintiff and other members of the Class by, among other things, fraudulently

assisting the Scheme Defendants to misvalue the Fund's investment holdings, thereby artificially inflating the NAV of the Fund, and concealed these actions and activities from the investing public.

181.    During the Class Period, the Auditor disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

182.    The Auditor violated §10(b) of the Exchange Act and Rule 10b-5(b) in that they made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

183.    As described above, the Auditor acted with scienter throughout the Class Period, in that they affirmatively and knowingly or with reckless disregard participated in the scheme to defraud investors.  In addition, the Auditor either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.  The Auditor engaged in this misconduct to, among other things, conceal the true valuation of the Fund's investments from the investing public and to support the artificially inflated prices of the Fund's shares.

184.    Plaintiff and other members of the Class have suffered damages in that they acquired the Fund's shares at prices artificially inflated by the Auditor's fraudulent course of conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities or would not have purchased or otherwise acquired them at the inflated prices that were paid.

185.    As a direct and proximate result of the Auditor's wrongful conduct, Plaintiff and other members of the Class suffered damages attributable to the fraud alleged herein in connection with their respective purchases of the Fund's shares.

186.    By virtue of the foregoing, the Auditor violated Section 10(b) of the Exchange Act and Rules 10b-5(a)-(c) promulgated thereunder.

**COUNT V**
**Violation of Section 36(b) of the**
**Investment Company Act of 1940**
<u>(Against the Adviser and the Trustee Defendants)</u>

187.    Plaintiff repeats and realleges each allegation contained in the foregoing paragraphs as if fully set forth herein.

188.    Plaintiff brings this claim derivatively on behalf of and for the benefit of the Fund against the Adviser and the Trustee Defendants.

189.    The Fund is a registered investment company within the meaning of the 1940 Act.

190.    The Adviser is an investment adviser for the Fund as that term is defined in Section 2 of the 1940 Act (the "Adviser").

191.    Pursuant to Section 36(b) of the ICA, 15 U.S.C. § 80a-35(b), the investment adviser of a mutual fund owes to the mutual fund the fiduciary duties of loyalty, candor, and due care with respect to the receipt of compensation for services or payments of a material nature paid by the mutual fund to such investment adviser or any affiliated person. Those fiduciary duties apply not only to the terms of the advisory fee agreements, but also to the manner in which advisers seek approval of such agreements.

192.    Thus, the Adviser owed the Fund and its shareholders fiduciary duties of loyalty, candor, and due care with respect to its receipt of compensation for services or payments of any material nature paid by the Fund. Those fiduciary duties include, but are not limited to, the duty of

the Adviser to seek approval of any advisory agreement upon full disclosure of all information material to the Trustees' decision regarding the Adviser's compensation.

193.    Pursuant to Section 15(c) of the 1940 Act, 15 U.S.C. § 80a-15(c), the investment adviser of a mutual fund owes to the mutual fund the duty to furnish the directors of the fund "such information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve or act as investment adviser of such [mutual fund] company."

194.    Among other things, Section 36(b) of the 1940 Act prohibits and prohibited the Adviser from soliciting the approval of any advisory agreement and fees from the Fund by use of false or misleading information, namely a knowingly false and inflated NAV. Information concerning the Fund's NAV is particularly important to the Fund and to its Trustees because it served as one of the primary factors for determining the Adviser's fees. Since the NAV was inflated by over 80% during and/or within the Relevant Period, the Adviser was knowingly paying itself excessive fees based on that inflated NAV.

195.    By falsely and significantly inflating the NAV of the Fund, the Trustee Defendants allowed the Adviser to receive ill-gotten compensation under its advisory agreement. Had the Fund's NAV been accurately reported, the Adviser would have received almost no advisory fee.

196.    The Trustee Defendants and the Adviser breached their fiduciary duties by facilitating, encouraging and participating in the intentional inflation of the NAV which led to the payment of its grossly excessive and unreasonable advisory fees. Any compensation received on account of the false and misleading NAV, is disproportionate, excessive and unearned.

197.    Pursuant to Section 36(b) of the 1940, 15 U.S.C. § 80a-35(b), mutual fund shareholders may bring a civil action against an investment adviser or any affiliated person who has breached his or its fiduciary duty concerning such compensation or other payments.

198.    The Adviser and Trustee Defendants breached their fiduciary duty to the Fund by the acts alleged in this Complaint including, without limitation, facilitating, permitting, or encouraging, participating in, or failing to detect and prevent, an inflated NAV.

199.    The Adviser, with the assistance of Trustee Defendants, placed its own self-interest in maximizing its compensation and other payments over the interests of the Fund. As alleged herein, the Adviser and Trustee Defendants breached their fiduciary duties with respect to the receipt of compensation for services or other payments of a material nature from the Fund and its shareholders.

200.    By virtue of the foregoing, the Adviser and Trustee Defendants have violated Section 36(b) of the 1940 Act, 15 U.S.C. § 80a-35(b).

201.    As a direct and proximate result of the wrongful conduct alleged above, the Fund and its shareholders were harmed by, among other things, the payment of excessive fees based on the grossly inflated Fund NAV, for which the Adviser and Trustee Defendants are liable.

202.    Alternatively, under Section 47(b) of 1940 Act, 15 U.S.C. § 80a-46(b), Plaintiff seeks rescission of the Investment Management Agreement between the Fund and Adviser and restitution of all excessive investment advisory fees paid by the Fund pursuant to that agreement caused by the Adviser and Trustee Defendants.

## XI.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays for judgment as follows:

A.    That the Court determined that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, appoint Plaintiff as representative of the Class and her undersigned law firms as Co-Lead Counsel; and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes;

B.   The Court adjudge and decree that the acts, omissions and practices of the Defendants are illegal and unlawful, and constitute violations of the Exchange Act, 15 U.S.C. §78j(b), and Rules 10b-5(a)-(c) promulgated thereunder by the SEC, § 20(a) of the Exchange Act, and/or Section 36(b) of the 1940 Act (or, in the alternative, Section 47(b) of 1940 Act, 15 U.S.C. § 80a-46(b));

C.   That Judgment be entered against Defendants and in favor of Plaintiff and the Class for the amount of damages sustained by Plaintiff and the Class as allowed by law and/or recission, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law;

D.   That the Court award Plaintiff and members of the Class such other and further relief, whether injunctive, equitable or otherwise, as the case may require and the Court may deem just and proper under the circumstances.

## XII.   DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury.

Dated: October 29, 2025                        Respectfully submitted,

**DILWORTH PAXSON LLP**

/s/ *Lisa Rodriguez*
Lisa Rodriguez
Catherine Pratsinakis
Mariah Heinzerling (PHV to be submitted)
1650 Market Street, Suite 1200
Philadelphia, PA 19103
Telephone: (215)-575-7000
lrodriguez@dilworthlaw.com
cpratsinakis@dilworthlaw.com
mheinzerling@dilworthlaw.com

53

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Thomas L. Laughlin, IV (PHV to be submitted)
Matthew Peller (PHV to be submitted)
Susan Hu (PHV to be submitted)
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
tlaughlin@scott-scott.com
mpeller@scott-scott.com
shu@scott-scott.com

*Counsel for Plaintiff Rochelle Cramer and the Putative Class*

## <u>CERTIFICATION PURSUANT TO THE FEDERAL SECURITIES LAWS</u>

I, Rochelle Cramer, hereby certify that the following is true and correct to the best of my knowledge, information, and belief:

1.      I have reviewed the Class Action Complaint filed in this matter (the "Complaint"), and authorize the filing of this Certification.

2.      I am willing to serve as a representative party on behalf of the Class (as defined in the Complaint), including providing testimony at deposition and trial, if necessary.

3.      During the Class Period (as defined in the Complaint), I purchased the security that is the subject of the Complaint as set forth on the attached Schedule A.

4.      I did not engage in the foregoing transactions at the direction of counsel or in order to participate in any private action arising under the Securities Act of 1933 (the "Securities Act") or the Securities Exchange Act of 1934 (the "Exchange Act").

5.      During the three-year period preceding the date on which this Certification is signed, I have not (i) served or (ii) sought to serve as a representative party on behalf of a class in any private actions arising under the Securities Act or the Exchange Act:

6.      I will not accept any payment for serving as a representative party on behalf of the Class beyond its *pro rata* share of any recovery, except for such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 28th day of October, 2025.


*Rochelle Cramer*

Rochelle Cramer

1

## Schedule A

**Rochelle Cramer Transactions in Wildermuth Fund**
Ticker: WESFX
CUSIP:  96812D107
Class Period:  November 1, 2020 to June 29, 2023

| Transaction | Date | Shares | Price per Share |
|---|---|---|---|
| Purchase | December 28, 2021 | 44.778 | $13.57 |